FILED
OCT - 1 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:26 CR 00437 |
| | ) | Title 18, United States Code, Sections 664, 1028A(a)(1), 1343, and 1957 |
| SEKU N. SHABAZZ, | ) | |
| Defendant. | ) | |

**JUDGE NUGENT**

GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

Defendant and His Interrelated Fraud Schemes

1. Defendant SEKU N. SHABAZZ, formerly known as Jason Brooks, was a resident of Cleveland, Ohio, in the Northern District of Ohio, Eastern Division. Defendant was a licensed investment advisor. On or about December 29, 2025, the Ohio Department of Commerce, Division of Securities, filed a "Notice of Intent to Suspend or Revoke" Defendant's Ohio investment adviser representative license.

2. From in or around January 2020 through the date of this Indictment, Defendant held himself out as a successful business owner and financial professional. In reality, however, Defendant was engaging in a series of interrelated frauds further described below, all of which were designed to obtain funds from various individuals and entities to which he was not entitled and which Defendant used to fund his lifestyle and maintain the illusion of success.

a. *Employee Retirement Plan Theft*: In his first fraud, from in or around January 2020 through in or around May 2022, Defendant stole and embezzled his employees'

401(k) retirement saving plan contributions. Although Defendant withheld the retirement funds from his employees' paychecks, he did not remit them into his company's 401(k) plan. He also failed to pay required employer matching contributions. Instead, Defendant converted the funds to his own use and benefit, including to pay for memberships at a yacht club and at a private business and social club.

b. *Investment Fraud Scheme*: Once Defendant exhausted the stolen funds from his employees' 401(k) contributions, Defendant began operating an investment fraud Ponzi scheme. Beginning in or around September 2022, Defendant solicited individuals to loan him funds through a mortgage-backed investment vehicle. Defendant represented that he would use the loans and raised capital to make mortgage loans to real estate companies, developers, and other entities. Defendant further represented that the mortgaged properties would secure the individuals' loan and that he would generate a 15% annual return on investment for them by bundling and reselling the mortgage notes to institutional investors. In reality, Defendant misled and lied to investors, taking the money loaned and, contrary to representations and promises made to those investors, using that money to fund his lifestyle and at times make some payments to earlier investors and other creditors.

c. *Mortgage Fraud Scheme*: During a lull in incoming funds from the Investment Fraud Scheme, and while negotiating with the Employee Benefits Security Administration of the U.S. Department of Labor ("DOL") about repaying the stolen employee 401(k) contributions from the Employee Retirement Plan Theft, Defendant embarked on a third financial fraud. In or around June 2024, Defendant used the identity of two individuals, without their permission or authorization, to give the false appearance that he controlled the individuals' company and therefore owned the individuals' residence. By misrepresenting to mortgage

lenders that he owned the residence, Defendant obtained a mortgage loan secured by the residence. Defendant then used some of the proceeds from the fraudulently obtained mortgage to repay the 401(k) plan participants.

Defendant's Companies

3. Defendant was the President and Chief Executive Officer of Great Lakes Retirement Planning, LLC, which was a wealth management and financial advisory firm. Defendant further controlled multiple companies that Defendant used to promote and finance his mortgage lending venture, including the Great Lakes Family of Companies, LLC, Great Lakes Commercial Mortgages, LLC, Great Lakes Rental Mortgages, LLC, Great Lakes Loan Servicing, LLC, Great Lakes Securities, LLC and Great Lakes Investment Partners, LLC (together with Great Lakes Retirement Planning, LLC, the "Companies").

4. As President and Chief Executive Officer of the Companies, Defendant was ultimately responsible for, among other things, the Companies' finances, including employee payroll, payroll withholding and remittances, and authorizing payments to vendors, creditors, and other third parties from the Companies' accounts. While Defendant at times delegated these duties to other employees, Defendant decided who to pay, when to pay, and how much to pay for the Companies' expenses.

The 401(k) Profit Sharing Plan

5. On or about November 1, 2019, Defendant created the Great Lakes Financing LLC 401(k) Profit Sharing Plan (the "Plan"), which was a profit-sharing retirement plan under Section 401(k) of the Internal Revenue Code. The Plan was amended and restated on or about June 26, 2021. The Plan was an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan provided retirement benefits to certain employees of the Companies and was funded through employee payroll deferrals. Based

on the Plan's election, the Companies were required to make certain "safe harbor" contributions, a form of employer-matching contributions for 401(k) plans, to employees' accounts.

6. The Plan documents listed one of the Companies as the Plan Sponsor and Plan Administrator. Defendant was the Trustee of the Plan. In this capacity, Defendant was responsible for authorizing remittances to the Plan relating to the Companies' employees.

7. Entity 1 was the Plan's asset custodian and record keeper.

8. Entity 2 was the third-party administrator for the Plan.

9. From on or about January 6, 2020, through on or about May 20, 2022, Defendant failed to remit and caused the failure to remit approximately $38,081.14 in total Plan participant contributions that were withheld from the wages of approximately 24 employees. During that same time, Defendant also failed to remit approximately $44,631.85 in employer safe harbor matching contributions and caused lost opportunity costs in the amount of approximately $14,355.82.

10. On or about November 7, 2022, the DOL contacted Defendant regarding the outstanding Plan contributions.

11. On or about March 14, 2023, the DOL opened a civil investigation into Defendant regarding the outstanding Plan contributions.

12. On or about April 4, 2024, the DOL sent a letter to Defendant: (i) informing Defendant that he violated ERISA by failing to remit employee contributions and safe harbor match amounts to the Plan; and (ii) instructing Defendant to contact the DOL within 10 days "to discuss how you plan to correct these violations and restore losses to the Plan."

13. On or about April 11, 2024, the DOL informed Defendant that he owed approximately $95,498.98 to the Plan, which amount comprised unremitted employee

contributions, unremitted safe harbor match contributions, and lost opportunity costs. The DOL further informed Defendant that the deadline to remit this amount was April 30, 2024, after which the DOL would recalculate the amount to add additional lost opportunity costs.

14. On or about May 29, 2024, the DOL gave Defendant an updated Plan repayment amount of approximately $97,068.81, the deadline for which was July 15, 2024.

The Investor Victims and Other Entities

15. Victims 1 through 9 (together, and with other victim investors, the "Victim Investors") were investors in Defendant's mortgage lending venture. Victims 1 through 9 largely resided in and around the area of Cleveland, Ohio.

16. Bank 1 was a federally insured financial institution. The Companies had multiple accounts with Bank 1 that Defendant controlled, including the following: account ending in 0912 in the name of Great Lakes Investment Partners, LLC, and for which Defendant was the sole authorized signor (the "0912 Account"); and account ending in 8137 in the name of Great Lakes Financing, LLC, and for which Defendant was the sole authorized signor (the "8137 Account"). Victim 6 and Victim 7 also had accounts with Bank 1. Bank 1 processed its customer account transactions through Bank 1's servers outside of the State of Ohio.

17. Bank 2 was a federally insured financial institution. Victim 5 had an account with Bank 2. Bank 2 processed its customer account transactions through Bank 2's servers in Maryland.

18. Fedwire Funds Service ("Fedwire") was a real-time electronic funds-transfer service operated by the United States Federal Reserve. Fedwire processed wire transactions through its servers in New Jersey and Texas.

The Identity Theft Victims and Other Entities

19. Victims 10 and 11 were married (together, the "Identity Theft Victims").

20. Victim Entity 1 was an Ohio corporation owned and controlled by the Identity Theft Victims. In or around July 2022, the Identity Theft Victims, through Victim Entity 1, refinanced a mortgage on their residential property located in Independence, Ohio, in the Northern District of Ohio, Eastern Division (the "Residence") with Defendant.

21. Nominee 1 was Defendant's mother. On or about February 21, 2025, in connection with a Guardianship application, Nominee 1 was determined to be incapable of independent "financial management." On or about April 28, 2025, Nominee 1 passed away at the age of 78.

22. Lenders 1 through 3 (together, the "Lenders") were private lending companies that provided mortgage loans.

23. Title Companies 1 through 6 (together, the "Title Companies") were title companies and similar entities that researched real property history and ownership claims.

COUNT 1
(Embezzlement from an Employee Benefit Plan, 18 U.S.C. § 664)

The Grand Jury charges:

24. The allegations contained in Paragraphs 1 through 9 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

25. From on or about January 6, 2020, through on or about May 20, 2022, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ did knowingly embezzle, steal and unlawfully and willfully abstract and convert to his own use and the use of another, the moneys, funds, credits, property, and other assets of an employee pension benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, and of a fund connected with such plan, to wit: approximately $38,081.14 belonging to the Great Lakes

Financing LLC 401(k) Profit Sharing Plan, in violation of Title 18, United States Code, Section 664.

COUNTS 2-7
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

26. The factual allegations contained in Paragraphs 1 through 4 and 15 through 18 are re-alleged and incorporated as though fully set forth herein.

The Scheme to Defraud

27. From in or around September 2022, through on or about the date of this Indictment, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ devised and intended to devise a scheme and artifice to defraud the Victim Investors and to obtain money and property from the Victim Investors by means of materially false and fraudulent pretenses, representations, and promises.

Purposes of the Scheme

28. The purposes of the scheme were, among others, to: (a) use false and fraudulent pretenses to induce the Victim Investors to give money to Defendant to participate in his mortgage lending venture; (b) conceal and prevent detection of the scheme; and (c) enrich Defendant and his designees.

Manner and Means of the Scheme

29. It was part of the scheme that:

a. Defendant solicited the Victim Investors to loan him funds through a mortgage-backed investment vehicle.

b. Defendant raised funds from the Victim Investors through materially false and fraudulent representations, including the following misrepresentations:

i. Defendant would use the Victim Investors' funds to make mortgage loans to real estate companies, developers, and other third-party entities.

ii. Defendant would package and resell the mortgage notes to institutional investors, which in turn would generate a guaranteed 15% annual return on investment for the Victim Investors.

iii. The Victim Investors would receive a first or second lien position on the mortgaged properties, which was designed to give Victim Investors the false impression that their investment was collateralized or otherwise secure.

iv. Defendant would personally and fully guarantee the Victim Investors' principal investment amount, which likewise was designed to give Victim Investors the false impression that their investment was secure.

v. Defendant would use Victim Investor funds for loan capital only.

vi. The use of Victim Investor funds for the Companies' working capital would be "strictly prohibited."

vii. The Victim Investors would receive an annual audit of their funds.

c. To convey a false sense of exclusivity and urgency, Defendant typically told Victim Investors that he already had raised a significant amount of capital from other sources and only needed a few more investors before closing the investment opportunity.

d. Defendant caused the Victim Investors to send money under false and fraudulent pretenses to bank accounts that Defendant controlled.

e. Defendant used lulling techniques designed to falsely reassure the Victim Investors, solicit further funds, delay complaints and inquiries, and avoid detection, including the following:

i. Defendant provided initial interest payments to the Victim Investors, which were designed to give the Victim Investors a false sense of the venture's legitimacy and at times resulted in the Victim Investor providing additional funds to Defendant, when, in truth, the Victim Investors were receiving little to no true investment returns.

ii. Defendant blamed third parties—including financial institutions, government agencies, excessive regulations, vexatious litigators, and family members—for delays in payment.

iii. Defendant attempted to coerce the Victim Investors to sign settlement agreements and other documents that promised to refund their investments but that substantially limited their legal recourse against Defendant and falsely mispresented that Defendant's "new" investors required such agreements, all of which was designed to delay Victim Investor complaints to law enforcement and other regulatory agencies.

f. Rather than use the Victim Investors' funds as represented and promised, Defendant instead used the Victim Investors' funds to repay earlier Victim Investors, pay other expenses for the Companies, and enrich himself and his designees.

<u>Acts in Furtherance of the Scheme</u>

30. In furtherance of the scheme, and to accomplish its purposes and conceal the existence thereof, Defendant committed and caused to be committed, in the Northern District of Ohio, Eastern Division, and elsewhere, the following acts, among others:

*Victim 1 and Victim 2*

31. On or about the following dates, Victim 1, Victim 2, and Defendant exchanged the following emails[1]:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| September 6, 2022 | Defendant | Victim 1 | "Hello [Victim 1], I would be very happy to set up a short call with you. I have attached the investment summary. We are looking to raise $2MM. So, we will be happy to look at any investment opportunities over $100K. We are paying 15%. As you will read, we return the principal every 30 days to the Joint SPV [Special Purpose Vehicle]. The investment is fully collateralized and not deployed until we have a note buyer under contract to purchase the loans. I hope all is well. Cheers." |
| September 21, 2022 | Defendant | Victim 2, cc'ing Victim 1 | Defendant sent an email responding to a series of questions posed by Victim 2 regarding the potential investment, including:<br><br>Victim 2's Question: "Is there a way to model out how you will be receiving proceeds throughout the process that allows you to pay a 15% yearly return on our/other lenders loans, on a monthly basis. I am trying to get my head around the math-and am having trouble understanding how the borrower will clear that kind of cash monthly."<br><br>Defendant's Answer: "Here is our fee list:<br>Loan Origination: 2%<br>Loan Underwriting: 1.9%<br>I/O + Initial PITI: 1.6%<br>Sale of Note: 2.5%<br>8.0%<br>Cost of Interest: 1.25% (15% divided by 12 months)<br>Cost of Business (salaries, ect): 4.25%<br>Gross Profit: 2.5% |

1 In this Indictment, the contents of the emails quoted are printed as they were in the original source, unless otherwise indicated through an ellipsis (". . .") or bracketed text to indicate omitted or modified text, or to explain the terms used.

| Date | Sender | Recipient | Text, Excerpt, or Description |
| --- | --- | --- | --- |
| | | | **Remember we only hold the loans for 30 days on our books. That is the 1.25% interest we are paying for the loan capital."<br><br>Victim 2's Question: "Why are you creating a special purpose vehicle for this investment?"<br><br>Defendant's Answer: "The SPV is so that you are completely isolated from Great Lakes Financing, LLC. Should something happen to me, the business gets sued, or the company loses a license, your lien is perfectly free and clear. You are indemnified fully and completely from the Lender. The SPV cannot be legally attached."<br><br>Victim 2's Question: "When would you like to share your personal financials with us-and outline who is in line before us. We would also like to understand the financials of Great Lakes Financing LLC & separately, Great Lakes Investment Partners Fund B, LLC (assuming this is a shell entity with limited holdings)-and where we would fall in line relative to a guarantee by these entities."<br><br>Defendant's Answer: "Here is the order of perfected real estate liens:<br>1. [redacted entity name]<br>2. Your Entity & SPV<br>3. Great Lakes Financing, LLC<br>4. Loan Borrower"<br><br>Victim 2's Question: "What is the difference between APR and the annual interest rate you proposed of 15%."<br><br>Defendant's Answer: "You will make 15% over the course of 12 months. It equates to 1.25% a month. As you can see by the above math model the margins in this business are very strong. We can afford to pay 15% APR [t]o our loan capital partners." |

32. On or about September 28, 2022, Defendant caused Victim 1 to execute a Junior Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

33. On or about September 28, 2022, Defendant caused Victim 1 to wire approximately $100,000 to a bank account that Defendant controlled.

34. On or about September 28, 2022, Defendant caused Victim 1, on behalf of a company that Victim 1 and Victim 2 controlled, to execute a Junior Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

35. On or about September 28, 2022, Defendant caused Victim 1, on behalf of a company that Victim 1 and Victim 2 controlled, to wire approximately $100,000 to a bank account that Defendant controlled.

36. On or about the following dates, Victim 1, Victim 2, and Defendant exchanged the following emails:

| **Date** | **Sender** | **Recipient** | **Text, Excerpt, or Description** |
|---|---|---|---|
| September 24, 2024 | Defendant | Victim 1 and Victim 2 | Attaching five attachments entitled Seku Shabazz 2022 1040 - Filing Copy.pdf; Seku Shabazz 2023 1040 - Filing Copy.pdf; GLRM Investor Pitch Deck 05.20.2024.pdf; Business Plan GLM 01.20.2024.pdf; and GLRM Income Statement 09.17.2024; and stating: "Hello [Victim 1] and [Victim 2], I am sorry that this took so long. I have had a very interesting 27 months. I have attached the following documents to give you an idea and a narrative of how I have been busy at work over the past two years. 1. Last 2 Years Tax Returns 2. Consolidated Business Plan 3. Pitch Deck (raise is fully completed) 4. YTD Income Statement 2024 Right now, I have furloughed on the last day of May all of the staff with the exception of IT. I knew that I was going to receive the $8.8MM as it was under contract pending conditions. As you know those conditions were met. But I could not complete the implementation of the business plan, move |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | offices, change over all of our technology, have all new lending documents in place, and close loans profitably at the same time. I have been "brokering" loans since July to present to keep the cash flow stable with a full relaunch scheduled for 11/04/2024 when the existing staff and the new hires (I am currently interviewing) all come back. I have been burning the 'midnight oil' rather extensively this summer. I have not been paying for audited financials since they cost about $40K. I was literally just trying to save money. I hope that does not upset either of you. I have collected about $2.2MM in $100K tranches of capital just like your $200K that you put in. The new $8.8MM investor has requested a 'lock-up' provision for the funds to be one year. It will expire on 10/01/2025 when the entire $10MM is wound down. His $8.8MM will go back to him (his family office) and the $2.2MM will go back to the both of you and the other investors. Very soon I will have a new contract for everyone to sign. I am very hopeful that you will both stay in one single year longer. It will kind of pull apart all that I have worked for over the last 27 months if even one investor pulls out. I know the reporting has not been up to standard, but I have paid every single interest payment on time after the first 2 had issues almost 2 years ago. I am happy to have the both of you to our new office for you to see the progress and see the new technology and business plan in action. I hope all is well. Cheers." |
| April 15, 2025 | Defendant | Victim 1 and Victim 2 | "Hello [Victim 1] & [Victim 2], I have been working over the last year to start up a Broker/Dealer to purchase loans from other lenders and stop generating loans directly through our company. This unfortunate lawsuit that I was involved in that shut down my bank account last month accelerated this process. I was planning on executing this business plan in October of this year. It is a lot easier to buy closed loans that it is to start them from scratch. Last week I signed a contract with a very large investor to come aboard as an Equity Partner in |

| Date | Sender | Recipient | Text, Excerpt, or Description |
| --- | --- | --- | --- |
| | | | the new firm Great Lakes Securities, LLC. We are going to idle my current Mezzanine Fund (that is what you are invested in) at Banc of Cal and then restart up later with United States Treasuries as our collateral rather than cash. Part of this winddown includes no longer sending out monthly interest dividend payments. This process is going to take about 90 days. I have to freeze all of my assets for a complete 3rd party audit, sell of all of the loans on our books, and outsource all of our current loan servicing business. I have a credit cancellation agreement draft that is attached to this email for your review." |

*Victim 3*

37. On or about September 1, 2023, Defendant caused Victim 3 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

38. On or about September 6, 2023, Defendant caused Victim 3 to wire approximately $75,000 to a bank account that Defendant controlled.

39. On or about September 25, 2023, Defendant caused Victim 3 to wire approximately $25,000 to a bank account that Defendant controlled.

40. On or about January 1, 2024, Defendant caused Victim 3 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

41. On or about January 2, 2024, Defendant caused Victim 3 to wire approximately $100,000 to a bank account that Defendant controlled.

42. On or about February 3, 2024, Defendant caused Victim 3 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

43. On or about February 5, 2024, Defendant caused Victim 3 to wire approximately $100,000 to a bank account that Defendant controlled.

44. On or about May 14, 2024, Defendant caused Victim 3 to wire approximately $100,000 to a bank account that Defendant controlled.

45. On or about May 15, 2024, Defendant caused Victim 3 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

46. On or about June 27, 2024, Defendant caused Victim 3 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

47. On or about July 2, 2024, Defendant caused Victim 3 to wire approximately $80,000 to a bank account that Defendant controlled.

*Victim 4*

48. On or about November 10, 2023, Defendant caused Victim 4 to send a cashier's check in the approximate amount of $10,000 to a bank account that Defendant controlled.

49. On or about October 2, 2024, Defendant caused Victim 4 to send a personal check in the approximate amount of $5,000 to a bank account that Defendant controlled.

50. On or about October 4, 2024, Defendant caused Victim 4 to send a personal check in the approximate amount of $3,500 to a bank account that Defendant controlled.

*Victim 5 and Victim 6*

51. On or about October 15, 2024, Defendant caused Victim 5 and Victim 6 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

52. On or about October 17, 2024, Defendant caused Victim 5, on behalf of a company that Victim 5 and Victim 6 controlled, to wire approximately $225,000 to a bank account that Defendant controlled.

53. On or about January 29, 2025, Defendant caused Victim 5 and Victim 6 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

54. On or about January 30, 2025, Defendant caused Victim 5, on behalf of a company that Victim 5 and Victim 6 controlled, to wire approximately $50,000 to a bank account that Defendant controlled.

55. On or about January 30, 2025, Defendant caused Victim 6, on behalf of a company that Victim 5 and Victim 6 controlled, to wire approximately $50,000 to a bank account that Defendant controlled.

*Victim 7*

56. On or about October 15, 2024, Defendant caused Victim 7 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

57. On or about October 16, 2024, Defendant caused Victim 7 to wire approximately $75,000 to a bank account that Defendant controlled.

58. On or about January 29, 2025, Defendant caused Victim 7 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

59. On or about January 30, 2025, Defendant caused Victim 7 to wire approximately $50,000 to a bank account that Defendant controlled.

60. On or about the following dates, Victim 5, Victim 6, Victim 7, and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| February 18, 2025 | Defendant | Victim 7 | "Hello [Victim 7], Sorry, this is late, but I have had a terrible case of the Flu A. I will have your 1099 out next week for sure." |
| March 10, 2025 | Victim 7 | Defendant | "Hi Seku, Hope you are well. Didn't see a prorated disbursement come through for our second tranche of investment. Will this be included in the next payment on 3/15? Separately, are the 2024 tax forms available?" |
| March 14, 2025 | Victim 7 | Defendant | "Hi Seku – any update on tax forms?" |
| March 14, 2025 | Defendant | Victim 7 | "You have not gotten these yet! Damn it! I am very sorry I will call the CPA right now. Cheers." |
| March 17, 2025 | Victim 7 | Defendant | "Hi Seku – any status update from your CPA? Have interest payments been sent out for both investment tranches?" |
| March 20, 2025 | Defendant | Victim 7, Victim 5 and Victim 6 | "Hello [Victim 6], [Victim 5], & [Victim 7], I have just spoken to [Victim 7] on the phone, and she has indicated that you are requesting a full refund of your investment. That is not a problem at all. I will seek to recall the funds from the custodian in accordance with our agreement. Your 1st lien position in the funded real estate will be liquidated effective today. All funds will be delivered to you within 60 days of today. I will reach out to the company attorneys today [to] prepare the documents. You will have them to review by Monday March 24th at Noon EDT. I thank you for your time and efforts and I appreciate your investment in Great Lakes Investment Partners, LLC. Cheers." |
| March 21, 2025 | Defendant | Victim 7, Victim 5 and Victim 6 | "Hello [Victim 7], [Victim 5], & [Victim 6], I first would like to start off with an apology for my tone on the phone with [Victim 7] and my email to all three of you yesterday. It was unprofessional, and unwarranted. I have many faults. Dishonesty is not one of them. However, I have been working on my bad temperament for the past 30 years. It has been an impediment to me personally and professionally. I offer no excuses for my behavior. I am requesting the opportunity to meet face-to-face with all three of you tonight at [a business and social club in] Cleveland. You can pick the time. I would like to explain to you in person the following items: |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | 1. A detailed explanation of our Business Plan and how your funds are used in the process (I have attached the Flow of Funds Chart). 2. Your investment funds are currently at the Warehouse Line Custodian and are not in any accounts in my name or the company's name. 3. Your investment funds are currently invested in several real estate loans in the state of Nebraska in a 1st lien position. 4. Your investment dividends are not paid out of any clients' investment funds rather out of the profits from Great Lakes Rental Mortgage. 5. A brief explanation of the outside pressure I have been under in my personal life that has caused me to miss work. For the record: 1. Your investment has allowed my firm to have access to $10MM in Warehouse Line Credit up from $5MM I have had previously. 2. That has allowed me to hire a marketing person and to begin to advertise (the outreach is temporarily on hold). 3. I have been able to hire an underwriting manager as well. 4. You have created jobs here at my office and with other partner firms. 5. By the end of Q3 I will have closed enough loans to move to a $20MM in Warehouse Line of Credit without additional investment funds. But; Business is Business: 1. To get your funds back I have to terminate the agreement with the Warehouse Line of Credit for the $10MM as I will not have my 20% match (please see the attached chart). 2. I will have to pay a pre-payment-penalty of $45K (this has nothing to do with your investment and will not come out of your funds). 3. That process takes about 30 days to unwind the $10MM in loans that are currently outstanding. 4. It will take about another 30 days to unwind the current funding contracts in place after the Warehouse Line is reduced. I will not have to pay fees, but we have to give a 30-day window for cancellation according to the SAFE-ACT and NMLS Guidelines. 5. Your funds will then be delivered in full to your bank accounts on record. I can understand if you want to move on. I have enclosed our Broker/Dealer pitch deck for you to see where I want to take my company in the next |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | few months. I have a hard head and a big mouth, but I know how to make money. I have had clients invested in this fund since 10/15/2023. I am happy to have them write letters of recommendation to you all and to your management team. Again, I apologize for my language & behavior. If you cannot make a meeting today, then I am happy to meet with you all anytime this weekend. I hope all is well. Cheers." |
| March 21, 2025 | Victim 6 | Defendant, cc'ing Victim 5 and Victim 7 | "Thank you. You had said in your first email to us this week that we'd be receiving our dividend today. Where is it?" |
| March 21, 2025 | Defendant | Victim 6, cc'ing Victim 5 and Victim 7 | "Coming . . ." |
| March 21, 2025 | Victim 6 | Defendant, cc'ing Victim 5 and Victim 7 | "Coming as in will be in our account today?" |
| March 21, 2025 | Defendant | Victim 6, cc'ing Victim 5 and Victim 7 | "Sorry . . . I hit the send button too fast. Your dividend payment will be increased to get you your full interest amount you have earned to date. I am reaching out to our attorneys to draft the cancellation paperwork effective today March 21st. You will then be paid every penny you are owed while the process to refund your principal is completed as per the previous email I have sent you. That amount I do not have calculated at the time of this email. I will have our CPA firm get that information to me today. Since your account is closing our attorneys prefer to have you fully cashed out in one final dividend payment (partial and full) and sign the contact cancellation at the same time. There will also be a hard delivery date in that cancellation document for the full delivery of your initial investment funds. We have never had a client cancel the contact before the one-year term and this is the legal advice I have been given. This |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | process should only take a couple of days. I have instructed our attorneys to move with all due haste. I wish you nothing but the best. Cheers." |
| March 25, 2025 | Defendant | Victim 6, Victim 5 and Victim 7 | (1) Attaching a draft document entitled "Cancellation of the Credit Agreement" and (2) stating: "I need to point out that on page 1 of 5 of your Real Estate Secured Revolving Agreement there is a clause of 'late payments' . . . A late payment does not violate the entire agreement. However, you asked for a refund, and I will provide it no questions asked. The funds are currently being unwound by the custodian and the warehouse credit line bank as I have previously stated in my email to you on March 21st. I wish you all well in any future endeavors you have." |

*Victim 8 and Victim 9*

61. On or about November 20, 2024, Defendant caused Victim 8 and Victim 9 to execute a Real Estate Secured Revolving Credit Agreement, which Defendant signed on behalf of the Companies.

62. On or about November 26, 2024, Defendant caused Victim 8 and Victim 9 to wire approximately $90,000 to a bank account that Defendant controlled.

63. On or about the following dates, Victim 8, Victim 9, and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| March 19, 2025 | Defendant | Victim 8 and Victim 9 | "Hello [Victim 8] and [Victim 9], I wanted to take a minute today to send you a personal email. I have not been up to my typical professional self as I have been facing some very strong headwinds in my personal life. You of course know all of this but I am making sure you understand how hard I am working to but this all back together. The past 4 weeks have been extremely painful.<br>1. Family |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | 1. My mother suffered a stroke this past weekend and has pretty bad dementia.<br>2. I have missed a lot of work over the last 90 days associated with this taking care of her and taking her to her medical appointments.<br>3. I am also fighting my brother in court over Guardianship of her estate so I do not have any other family to help me with her.<br>2. 1099s<br>1. They are delayed as I have been very vigilant about changing the passwords for the company bank accounts.<br>2. I did not realize that CPA firm did not have access to our bank records until Monday of this week.<br>3. You will have them by Friday March 21st.<br>3. March 15th Payment<br>1. Because of all of the stress I have been under and working weekends I played Hookey on St. Patrick's Day Monday the 17th<br>2. I dropped and stepped on my business phone cracking the screen and it disabled the Face ID.<br>3. I need the phone as there is an RSA app that I used to confirm the ACH transactions through the bank website.<br>4. I am getting the phone fixed on Thursday. It is an iPhone 10, and I had to order the part on Amazon as it is no longer carried at the Apple store.<br>5. I will send out the ACHs on Friday March 21st.<br>4. Personal Lawsuit<br>1. My ex-girlfriend has sued me personal and professional for back pay.<br>2. She was never an employee but did help me in the office as a 1099 contractor.<br>3. The attorney that I am working with has looked at my business records and agrees with me that this is a fraud case.<br>4. This has tied up my personal accounts and my Great Lakes Rental Mortgage account.<br>5. I missed payroll and had to lay off my staff.<br>As you know, I am always completely honest and upfront no matter how painful or embarrassing it is for me to admit faults and |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | mistakes. I want to thank you in a private email for your support and confidence in me and my firm. I have over $400K ($207K in my business account and $200K in sales) that is coming in by next week. Your investment funds are completely unaffected from all of this and are still with our banking custodian partner. I hope all is well. Cheers." |
| March 21, 2025 | Defendant | Victim 9 | "Hello [Victim 9], I have received a check for $40,000.00. I have deposited this check today. I am pressing the bank to release the hold on the check. Please see the attached HUD-1 statement. I will pay both of your paychecks as soon as it clears. I am very sorry about all of this." |
| March 25, 2025 | Victim 9 | Defendant | "Hello Seku, Can we expect payments this week? We really need to have it before the end of the month." |
| March 25, 2025 | Defendant | Victim 9 | "Yes." |
| April 4, 2025 | Victim 9 | Defendant | "Hello Seku, I'm checking in to see when my past due paychecks will be deposited. Last communication I receive was that the money was going to be deposited on 3/28." |
| April 4, 2025 | Defendant | Victim 9, cc'ing Victim 8 | "Hello [Victim 9], Here is my plan that is my goal to get you paid 100%.<br>1. Legal<br>a. Going to court on April 10th to get access to my corporate bank account restored from the lawsuit.<br>b. It was not from the [name redacted] Lawsuit. But from something else. That is why I invited you to the office.<br>c. $207K in the account.<br>2. Personal Loans<br>a. I have a client friend that is willing to lend me funds.<br>b. I met with him, his wife, and his attorney on April 1st.<br>c. I met with his CPA on Thursday April 3rd to decide on which shares to sell from his portfolio.<br>d. Between yesterday and today his account is down almost 11.5%.<br>e. That changes the dynamics of the loan, and we are working through the issues. |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | f. I am uncomfortable 'locking in' his market losses.<br>g. $200K at 1%<br>3. Loan Sales<br>a. I have 14 loans that are in the process of closing or are closed.<br>b. The main issue that I am working on is that my company fee agreement has the locked-up bank account on it.<br>c. I have gotten some of the Title companies to accept the new account numbers, but they want a new fee agreement signed.<br>d. I am working to get the new agreements signed. The difficult part is they want the borrowers to sign the new fee agreements, and they want to handle the process to make sure this is not fraud.<br>e. I have no working relationships with these Title companies because I have been selling every loan via a broker agreement that has passed across my desk.<br>f. $323K in sales after splits<br>4. Raising Funds<br>a. I have at least a dozen Accredited Investors and Family Offices looking to invest in our original Secured Credit Agreement.<br>b. The process has been slow.<br>c. $1MM plus in soft interest.<br>I am doing everything I can, looking under every rock, and following every lead no matter how weak it is. I am in the center of a Hurricane. I am getting crushed at every turn every time I think the storm is over. I will get you the funds with ABSOLUTE certainty!!!" |
| May 9, 2025 | Defendant | Victim 8 and Victim 9 | "Hello [Victim 8] and [Victim 9], For what it is worth again I am sorry for everything. It was just bad timing that I thought the lawsuit from [name redacted] locked down the account. Turns out it was the IRS. Still don't know why Chase bank would not share any information with me. Doesn't matter now anyway. Now I get to mourn my mother and sue my brother at the same time. He claims our mother wrote me out of her will in December of last year. I should just move my office to the County Courthouse. |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | Please see the draft of the Credit Settlement Agreement. I am closing down the Warehouse Line. The bank is selling the assets but that is under their control per our contract. You will get all of your funds back plus interest. The delay is from selling the collateral. They get to choose the timing because of the fluctuation of interest rates they have the right under an early termination to maximize their profits. As soon as I can get access to my bank accounts, I will process your payroll. I hope all is well. Cheers." |
| May 21, 2025, at 4:51 p.m. | Defendant | Attorney for Victim 8 and Victim 9 | In response to correspondence from Victim 8 and Victim 9's attorney: "I thank you for your email and I hope this one finds you well. I do not understand [Victim 8] and [Victim 9] at all. Literally every single other investor client has signed the settlement agreement with almost no questions asked. I have no idea why they refuse. Any way it does not matter to me if they sign it or not. I will be sending the funds back to them on July 1st. I am currently involved in 4 separate lawsuits. I have been in court continuously since 2010 for various reasons. If they want to spend more money on a meaningless matter, they are very welcome. Here is how it is going to pay out:<br>1. They file a lawsuit.<br>a. Will take at least until the first week of June to get any kind of court date.<br>2. I then ask the court for a continuance of 30-45 days.<br>a. It is granted as I can write these court motions in my sleep.<br>3. I then make the July 1st payment contingent on them signing the attached agreement.<br>a. They refuse and I keep the funds in the bank earning interest.<br>b. They accept and sign it, and I send them the wire.<br>This is not my first experience with lawyers and courts. Let me know what they want to do. I hope all is well. Cheers." |

*Loss to Victim Investors*

64. As a result of the foregoing scheme and artifice, the Victim Investors were defrauded in at least the approximate amount of $1,238,500.

Execution of the Scheme

65. On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused to be transmitted the following writings, signs, signals, pictures, and sounds by means of wire communications in interstate commerce, to wit the following wire transfers of Victim Investors' funds under materially false and fraudulent pretenses to the 0912 Account, which Defendant controlled, each transmission sent from the State of Ohio and routed across state lines, and each transmission constituting a separate count of this Indictment:

| Count | Date | Description of Wire Transmission |
|---|---|---|
| 2 | October 16, 2024 | Wire transfer of $75,000 from Victim 7's Bank 1 account to Defendant |
| 3 | October 17, 2024 | Wire transfer of $225,000 from Victim 5's Bank 2 account to Defendant |
| 4 | November 26, 2024 | Wire transfer of $90,000 via Fedwire from Victim 8 and Victim 9 to Defendant |
| 5 | January 30, 2025 | Wire transfer of $50,000 via Fedwire from Victim 5 to Defendant |
| 6 | January 30, 2025 | Wire transfer of $50,000 from Victim 7's Bank 1 account to Defendant |
| 7 | January 30, 2025 | Wire transfer of $50,000 from Victim 6's Bank 1 account to Defendant |

All in violation of Title 18, United States Code, Section 1343.

COUNT 8
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

66. The allegations contained in Paragraphs 1 through 14, 16, and 18 through 23 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

The Scheme to Defraud

67. From in or around April 2024, through on or about the date of this Indictment, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ devised and intended to devise a scheme and artifice to defraud the Lenders by means of materially false and fraudulent pretenses, representations, and promises.

Purposes of the Scheme

68. The purposes of the scheme were, among others, to: (a) use false and fraudulent pretenses to obtain money from the Lenders; (b) conceal and prevent detection of the scheme; and (c) enrich Defendant and his designees.

Manner and Means of the Scheme

69. It was part of the scheme that:

a. Defendant attempted to obtain alternative, private financing from the Lenders to pay off his outstanding debts, including repayment to the Plan as required by the DOL, because the Companies were financially strapped and unable to obtain funding from traditional financial institutions.

b. Defendant falsely represented to the Lenders that he had an ownership interest in the Residence which could serve as collateral for the loan, when, as Defendant knew, he had no ownership interest in the Residence and therefore could not legally encumber the property.

c. Defendant created false and fictitious documents that purported to give Nominee 1 control over Victim Entity 1, and which used the names and electronic signatures of Victims 10 and 11 without authorization.

d. Defendant submitted these false and fictitious documents to the Lenders to obtain, and attempt to obtain, financing under false and fraudulent pretenses.

e. Defendant used the Plan repayment deadlines with the DOL to convey a sense of urgency to the Lenders and the Title Companies, which was designed to pressure the Lenders and the Title Companies to expedite the funding process and to avoid detection of the false and fictitious documents.

f. Defendant caused Lender 1 to send money under materially false and fraudulent pretenses to a bank account that Defendant controlled.

g. Defendant used the funds obtained from Lender 1 to repay the Plan, pay other expenses for the Companies, and enrich himself and his designees.

h. Defendant defaulted on the loan from Lender 1, thereby causing Lender 3, which was the assignee of Lender 1, to foreclose on the mortgage on the Residence.

Acts in Furtherance of the Scheme

70. In furtherance of the scheme, and to accomplish its purposes and conceal the existence thereof, Defendant committed and caused to be committed, in the Northern District of Ohio, Eastern Division, and elsewhere, the following acts, among others:

71. On or about the following dates, the DOL and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| June 17, 2024 | DOL | Defendant | "Mr. Shabazz, I wanted to check in and see how things were progressing. Please let me know how the process is going and if there's anything I can clarify to assist." |
| June 17, 2024 | Defendant | DOL | "I am very sorry that I have not reached back out to you. I appreciate all of your efforts and I know how big a deal this is. We are closing in on having the funds to close out this case in full by the end of the month. I am just working as hard as I have in my life to put all the pieces together. I hope all is well with you. Cheers." |
| June 28, 2024 | DOL | Defendant | "Mr. Shabazz, Checking in to see how things are progressing. As you know, today is the 28th of June, the last business day of the month and the date you requested for an extension on May 21, 2024. Have you been able to restore funds to participants?" |

72. On or about June 28, 2024, Defendant, on behalf of one of the Companies, executed a Term Sheet with Lender 2 for a "capital deal" related to the Residence. The Term Sheet provided for: (a) a $125,000 term loan to Defendant for a term of 180 days; and (b) a first priority lien position for Lender 2 on the Residence.

73. On or about June 28, 2024, Defendant sent an email to the DOL, stating, "As you and I have discussed my credit score is really bad after the last two years of reorganizing this company. But I am tough, and I am honest. I have just received a loan only 10 minutes ago to pay the Voluntary Compliance amount in full. Please see the attached Loan Term Sheet [from Lender 2]. I will be receiving the funds no later than July 3rd, 2024. I will then on July 5th place those funds into the [Entity 1] accounts for the former employees and then wind down the 401(k) plan.":

74. On or about the following dates, an employee of Lender 2, an employee of Title Company 1, two employees of Title Company 2 and an employee of Title Company 3 (together, the "Lender 2 Email Group") and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| July 1, 2024 | Lender 2 Email Group | Defendant | "Seku, can you provide a screenshot or PDF of the 'transfers' for the county, showing that the property is owned by Great Lakes Financing, and not by [Victim Entity 1]? I wasn't able to follow along when you and [Employee of Lender 2] discussed that on Friday. An illustration would help." |
| July 1, 2024 | Defendant | Lender 2 Email Group | "Please see the attached payment to [real estate lender] for the [Residence]. You can see the payoff from the MERS [Mortgage Electronic Registry System] system. You will see that there are no other liens on the property when you do your lien search. This should show that GLF, LLC [Great Lakes Financing, LLC] owns the property free and clear. Cheers." |
| July 2, 2024 | Defendant | Lender 2 Email Group | "Do you have any update on Title? To say that I am under pressure is an understatement from the DOL. There is not one single lien on the property. That is all that matters for [Employee of Lender 2] to take possession should this loan default. We really need to move forward with this loan today." |
| July 2, 2024 | Defendant | Lender 2 Group | "Do you have a direct POC at Title that we can try to get an emergency closing as soon as today? Has anyone reached out about title work? Please press them today for answers." |
| July 3, 2024 | Defendant | Lender 2 Email Group | "I just got off the phone with the DOL. They accepted my extension request with the signed term sheet. They were actually pretty cool on the phone. I have until Tuesday July 9th 5:00 pm EST to send them a wire transfer verification that the funds are in my business account. Let's all have a good day off tomorrow and then get cracking on Friday or Monday at the latest. I appreciate everyone's hard work. Cheers" |
| July 9, 2024 | Lender 2 Email Group | Defendant | (1) Forwarding an email from an Employee of Title Company 4 on July 9, 2024, that stated: "no we can not close yet there are several title |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | items that need cleared before closing. The property is vested to [Victim Entity 1], however the loan is for Great Lakes Financing - are both of these companies owned by the same person? as we will need a deed transferring title so have several things we need to verify for each company to do so… there are also 2 mortgages and several liens on title we will need to clear before we are able to close."; and (2) adding the additional text: "[Employee of Title Company 4], the borrower (Seku, copied) has the details demonstrating that this was a MERS loan in cuyohoga county, and has shown the transfer paperwork showing the transfer to Great Lakes Financing. Seku, pulling you in to help explain the title issue. I am away from my computer. Can you attach the transfer paperwork and help explain the ownership issue to [Employee of Title Company 4]?" |
| July 9, 2024 | Defendant | Lender 2 Group and Employee of Title Company 4 | "Hello [Employee of Title Company 4], Cuyahoga County does not record loans electronically. They still stamp them and manually input the information. We use the MERS (Mortgage Electronic Registry System) will all of our notes that we produce. We require all of our note buyers to be on the system as well. [Real estate lender] funded 40% of the value of the loan at origination when we closed this loan in 2022. I have since bought the loan from them. I have attached all of the MERS paperwork and website printouts. I have also included all of the payments made by [Victim Entity 1] for all of 2024 proving that I own the loan. He has been paying on time and has not been late even once. I can be reached at [phone number redacted] if you would like to discuss this over the phone. I hope all is well with you. Cheers" |
| July 9, 2024 | Employee of Title Company 4 | Defendant, cc'ing Lender 2 Group | "The vested owner of the property based on the last recorded deed of record is [Victim Entity 1]. will they be at closing to sign off on the deed transferring the title to GreatLakes Financing?" |
| July 9, 2024 | Defendant | Employee of Title | "Hello [Employee of Title Company 4], They are my clients. They are not the owners of the |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | Company 4, cc'ing Lender 2 Group | property. I am. Please see the fully executed mortgage I have attached. I think that you should call me so that we do not have to keep going back and forth via email. Cheers" |
| July 9, 2024 | Employee of Title Company 4 | Defendant, cc'ing Lender 2 Group | "A mortgage doesn't place you in title, a Deed does, there is no deed of record transferring the property from them to you." |
| July 9, 2024 | Defendant | Employee of Title Company 4, cc'ing Lender 2 Group | "Hello [Employee of Title Company 4], Please stop all work. You do not understand the Non-Qualified Mortgage Sector." |
| July 9, 2024 | Employee of Title Company 4 | Defendant, cc'ing Lender 2 Group | "Will do. We can not issue title insurance / close on the file unless the deed of record and borrower match." |
| July 9, 2024 | Defendant | Lender 2 Group | "Hello [Employee of Lender 2], I am out of time. I need this to close. [Employee of Title Company 5] was all done with everything last week. At this time, I am going to request that we use his firm. The firms that have been recommended do not understand Non-Qualified Mortgages. That is why I am us[ing] [Title Company 5]. They have over a decade of experience in this matter. The DOL is on me like you cannot believe. If this is unacceptable to you then please cancel this loan. I have given you more than enough information to confirm that my firm owns this loan." |

75. On or about the following dates, the DOL and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| July 9, 2024 | DOL | Defendant | "Mr. Shabazz, Any updates on payments? Please keep in mind that our courtesy calculations are only good through the 15th of July." |

| **Date** | **Sender** | **Recipient** | **Text, Excerpt, or Description** |
|---|---|---|---|
| July 10, 2024 | Defendant | DOL | Defendant provided a list of closed and open Company employee accounts and stated: "For the accounts that are open they are ready to be funded. For the accounts that have been closed the account administrator and the TPA both have reached out to them via email and snail mail. . . . I am committed to getting this done. . . . The important thing is I HAVE the funds to correct this." |
| July 10, 2024 | DOL | Defendant | "If you make corrective payment now to [Entity 1], you'll achieve voluntary compliance." |
| July 10, 2024 | Defendant | DOL | "I will be making a full payment to [Entity 1]. To the open accounts and to a new account where they will place the funds according to the distribution instructions you have provided, and I have sent them. I will have some type of transaction report for you I am just not sure what it will look like." |
| July 10, 2024 | DOL | Defendant | "Sounds good. A final note- the department cannot tell you what to do or demand you do it this way, but this path forward will work for us, . . ." |
| July 11, 2024 | Defendant | DOL | "As you know I have taken all of this very seriously. This has been my sole focus since you visited our office in February. I want this to be over and move on and have my former employees move on. I took out a loan at effectively 25% to fund this transaction. I have been working every last detail and I have been losing a lot of sleep. I want everything to go perfectly. But this 2-year odyssey has had many pitfalls and issues. I have had to rely on a virtual army of people to get this right and completed. That is the real source of my concern is that I literally cannot fix this alone.<br>• [Bank 1] can make a mistake<br>• [Entity 1] can make a mistake<br>• [Entity 2] can make a mistake<br>• I can type in the numbers wrong<br>I am asking you and the DOL to just give me one more week to make sure that I can |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| | | | confirm the funds are in the proper accounts. I am so afraid of a banking error or a filing error that it is kind of making me crazy. I had a wire returned yesterday and I nearly broke down in tears. I am afraid of the call tomorrow with [Entity 1] if they tell me they need 2-3 business days to get it all right. Can you please extend the deadline to Monday July 22nd? Just one more week to get all of the official verifications to your office. I am very sorry to even type this because you have been more than fair. But I am ready to break the tape on the finish line and I just don't want to slip on the last three feet of a 26-mile race. I hope all is well. Cheers." |

76. On or about July 11, 2024, Defendant created a document which purported to be "Bylaws of [Victim Entity 1]" and to be "executed and agreed to" by Nominee 1 (the "Bylaws").

77. On or about July 12, 2024, Defendant created a document which purported to be a "Shareholder Agreement" for Victim Entity 1 that: (a) was made by and among Victim 10, Victim 11, Nominee 1 and Defendant; (b) listed the following shareholders and percentage ownership in Victim Entity 1: "[Nominee 1] – 81% [Victim 11] – 9% [Victim 10] – 5% Seku N. Shabazz – 5%"; and (c) was electronically signed by each of Nominee 1, Victim 10 and Victim 11 on July 12, 2024 at 5:33 p.m. and by Defendant on July 12, 2024 at 5:32 p.m. (the "Shareholder Agreement").

78. On or about July 12, 2024, Defendant created a document which purported to be a Certificate of Good Standing for Victim Entity 1 from the Ohio Secretary of State and which listed Nominee 1 as the "Agent/Registrant" for Victim Entity 1 (the "Certificate of Good Standing").

79. On or about July 17, 2024, Defendant caused Nominee 1 to execute a Loan Term Sheet with Lender 1, which: (a) listed Victim Entity 1 as the borrower, Nominee 1 as the principal, and the Residence as the property address; (b) provided for a $224,250 term loan to Victim Entity 1 for a term of 12 months; and (c) gave Lender 1 a first priority lien position on the Residence.

80. On or about July 17, 2024, the DOL and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
| --- | --- | --- | --- |
| July 17, 2024 | Defendant | DOL | "I am very confident that I have all of the details worked out now so they will send the funds this Friday July 19th. They were never going to send the funds to me directly due to my bad credit and the fact that Great Lakes Financing, LLC is not a functioning company. I have been on the phone with them for about 7 hours over the last three days. They are charging me another $3,000.00 to send the funds directly on an account-by-account basis rather than into a blob account. I was afraid of this, but I cannot control them. This is a high risk loan and they are the only ones that even agreed to lend me the money." |
| July 17, 2024 | Defendant | DOL | "The name of the finance company is [Lender 1]. Let me reach out to them and get some kind of proof of a wire." |

81. On or about July 23, 2024, Defendant created a document which purported to be a "Shareholder Meeting [Victim Entity 1]" that: (a) listed the following "members of [Victim Entity 1]"—"President: Nominee 1; Vice President: Victim 11; Secretary: Victim 10; Treasurer: Seku N. Shabazz"; (b) "call[ed] a special virtual meeting for July 23, 2024 11:00 am EDT"; (c) amended the bylaws of Victim Entity 1 to "assign the sole right to sign all contracts, agreements, and mortgages to the President of [Victim Entity 1], [Nominee 1]"; and (d) was

electronically signed by each of Nominee 1, Victim 10, and Victim 11 on July 23, 2024 at 11:09 a.m. and by Defendant on July 23, 2024 at 11:08 a.m. (the "Meeting Minutes").

82. On or about July 23, 2024, Defendant sent and caused to be sent to Lender 1, in connection with the closing on the mortgage, the Victim Entity 1 Bylaws, Shareholder Agreement, Certificate of Good Standing, and Meeting Minutes.

83. On or about July 29, 2024, Defendant caused Nominee 1 to execute a note in the name of Victim Entity 1 with Lender 1 in the amount of approximately $224,250, which note was secured by a mortgage on the Residence.

84. On or about the following dates, an employee of Title Company 6 and Defendant exchanged the following emails, in which Defendant attempted to have the mortgage proceeds deposited into one of the Companies' bank accounts:

| **Date** | **Sender** | **Recipient** | **Text, Excerpt, or Description** |
|---|---|---|---|
| July 30, 2024 | Employee of Title Company 6 | Defendant and Nominee 1 | "Hi [Nominee 1], Do you have a VOIDED check you can send for [Victim Entity 1] so we can wire the proceeds from the refi today?" |
| July 30, 2024 | Defendant | Employee of Title Company 6 | "Hello [Employee of Title Company 6], Please place the funds in this account. Cheers" |
| July 30, 2024 | Employee of Title Company 6 | Defendant | "Checking with our underwriter. Will advise shortly" |
| July 30, 2024 | Employee of Title Company 6 | Defendant, Nominee 1 and Employee of Lender 1 | "Per our underwriting counsel we have to disburse to the borrower in accordance with the closing statement. Please provide a voided check or we can issue you a check and overnight it to you." |
| July 30, 2024 | Defendant | Employee of Title Company 6 | "Hello [Employee of Title Company 6], I will get you a voided check. Please confirm the bank account needs to be for [Victim Entity 1] account. Cheers" |

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| July 30, 2024 | Employee of Title Company 6 | Defendant, Nominee 1 and Employee of Lender 1 | "Yes, that is correct." |

85. On or about July 30, 2024, Defendant opened and caused to be opened an account at Bank 1 in the name of Victim Entity (the "Victim Entity 1 Account"), for which Defendant was the sole authorized signor.

86. On or about the following dates, an employee of Title Company 6 and Defendant exchanged the following emails:

| Date | Sender | Recipient | Text, Excerpt, or Description |
|---|---|---|---|
| July 30, 2024 | Defendant | Employee of Title Company 6 | (1) attaching a "Direct Deposit Set-up Form" that contained a voided check for the Victim Entity 1 Account and listed Defendant's office as the business address for Victim Entity 1; and (2) stating: "Hello [Employee of Title Company 6], Please see the attached Direct Deposit information for [Victim Entity 1]. Please confirm when the wire has been sent. Cheers." |
| July 30, 2024 | Employee of Title Company 6 | Defendant | "Thank you, will do. Still waiting on lenders wire to disburse" |
| July 31, 2024 | Employee of Title Company 6 | Defendant, cc'ing Employee of Lender 1 | "Wires are released. Thanks everyone!!!" |

87. On or about July 31, 2024, Defendant caused Lender 1 to record the mortgage on the Residence with the Cuyahoga County Auditor.

88. On or about July 31, 2024, Defendant caused Lender 1 to send a wire transfer in the amount of approximately $218,120.62 to Title Company 6, which amount represented the mortgage principal minus fees and costs.

89. On or about July 31, 2024, Defendant caused Title Company 6 to send a wire transfer in the amount of approximately $206,622.67 to the Victim Entity 1 Account, which amount represented the net proceeds of the mortgage after closing costs.

90. On or about July 31, 2024, Defendant sent and caused to be sent a wire transfer in the amount of approximately $150,000 from the Victim Entity 1 Account to the 8137 Account.

91. On or about August 1, 2024, Defendant sent and caused to be sent a wire transfer in the amount of approximately $97,068.81 from the 8137 Account to Entity 1, which paid in full Defendant's outstanding obligation to the Plan.

92. On or about August 1, 2025, Defendant, through the foregoing steps, caused Lender 3, which had executed an Assignment of Mortgage with Lender 1 for the Residence on or about August 23, 2024, to file a complaint against the Identity Theft Victims seeking to foreclose on the Residence for nonpayment of the mortgage note that Defendant had caused to be executed on their home using their identities, without their knowledge or approval.

Execution of the Scheme

93. On or about July 31, 2024, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ, for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused to be transmitted the following writing, sign, signal, picture, and sound by means of wire communication in interstate commerce, to wit: a wire transfer via Fedwire of $206,622.67 from Title Company 6 to the Victim Entity 1 Account controlled by Defendant, which transmission was sent from the State of Ohio and routed across state lines.

All in violation of Title 18, United States Code, Section 1343.

COUNTS 9-11
(Engaging in Monetary Transactions in Criminally Derived Property, 18 U.S.C. § 1957)

The Grand Jury further charges:

94. The allegations contained in Counts 2 through 8 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

95. On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the following transfers of fraudulently obtained funds, such property having been derived from a specified unlawful activity, that is, Wire Fraud, in violation of Title 18, United States Code, Section 1343, as charged in Counts 2 through 8 of this Indictment, each transaction constituting a separate count of this Indictment:

| Count | Date | Description of Transaction |
|---|---|---|
| 9 | July 31, 2024 | Online transfer of $150,000 from the Victim Entity 1 Account at Bank 1 to the 8137 Account |
| 10 | August 2, 2024 | Wire transfer of $97,068.81 from the 8137 Account to Entity 1 |
| 11 | January 31, 2025 | Transfer of $150,000 from the 0912 Account to the 8137 Account |

All in violation of Title 18, United States Code, Section 1957.

COUNTS 12-13
(Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1))

The Grand Jury further charges:

96. The allegations contained in Count 8 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

97. On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant SEKU N. SHABAZZ did knowingly transfer, possess, and use a means of identification of another person, without lawful authority, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit: Wire Fraud, in violation of Title 18, United States Code, Section 1343, as charged in Count 8 of this Indictment, knowing that the means of identification belonged to another actual person, to wit: Victim 10 and Victim 11, each transfer, possession, and use constituting a separate count of this Indictment:

| **Count** | **Date** | **Description** |
|---|---|---|
| 12 | July 12, 2024 | Defendant electronically signed the names of Victim 10 and Victim 11 on the Victim Entity 1 Shareholder Agreement |
| 13 | July 23, 2024 | Defendant electronically signed the names of Victim 10 and Victim 11 on Victim Entity 1 Meeting Minutes |

All in violation of Title 18, United States Code, Section 1028A(a)(1).

FORFEITURE

The Grand Jury further charges:

98. The allegations of Counts 1 through 11 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c). As a result of the foregoing offenses, Defendant SEKU N. SHABAZZ shall forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the offenses charged in Counts 1 through 8; and any property, real or personal involved in the commission of the offenses charged in Counts 9 through 11, or any property traceable to such property.

Substitute Assets

In the event that any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and/or 18 U.S.C. § 982, as a result of any act or omission of the Defendant:

a.) cannot be located upon exercise of due diligence;

b.) has been transferred or sold to, or deposited with a third party;

c.) has been placed beyond the jurisdiction of this Court;

d.) has been substantially diminished in value; or,

e.) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) [as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c)], to seek forfeiture of any other property of the Defendant, up to an amount equivalent to the value of the forfeitable property described above.

A TRUE BILL.

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.